Memorandum of Decision
On October 15, 1998, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Anthony D. and Rosa A. to their six minor children: John, Noemy, Juliot, Anthony, Jennifer, and Hector. On May 18, 19, and 25, 2000, a consolidated trial of the petitions took place in this court. On May 25, 2000, Rosa A. filed a motion for transfer of guardianship, which the court consolidated with the trial of the termination petitions. For the reasons stated below, the court now denies the motion to transfer guardianship and grants the petitions to terminate parental rights.
FACTS
The court finds the following facts and credits the following evidence.
A. The Parents
The mother, Rosa Maria A., was born in 1968 in Puerto Rico. She left school after the fifth grade. She began an nonmarital relationship with the father, Anthony D., in 1988. From this relationship, six children were born: John Anthony, in 1989, Noemy in 1991, Juliot in 1992, Anthony in 1994, Jennifer in 1995, and Hector Anthony in 1998.[2]
The father was born in 1970. He completed the ninth grade in Puerto Rico. He became involved with illegal drugs in 1990. This habit led to several arrests on misdemeanor charges, domestic violence, and instability in his relationship with the mother during the first half of the 1990's.
On February 20, 1996, a Head Start teacher observed that five year old Noemy had a bruise on her lip and black and blue marks inside her mouth. Noemy stated that her father had hit her with his hand and that her mother was present at the time. She also received a bloody nose at the time.
During the summer of 1996, there were several domestic incidents involving the mother and father and the mother admitted to cocaine use. At approximately 4:00 a.m. on August 3, 1996, neighbors observed Noemy outside on her own in an area known for drug dealing and loitering by teenagers. The mother admitted that she had left her children alone while she went to look for the father. A state police trooper responding to the CT Page 6757 scene had Noemy go to the hospital because of an injured thumb that had been caught in a door several days earlier and that had not received any medical attention.
On August 20, 1996, as a result of these incidents, DCF obtained an order of temporary custody for the five children who had been born. The father returned to Puerto Rico for about five months. He did not maintain contact with the children or with DCF. The children were adjudicated neglected on November 22, 1996 and formally committed to DCF on October 8, 1997.
In December, 1996, at an unsupervised visit, the mother hit Juliot across the face, leaving a cut in his mouth. The mother stated that she had a right to hit her children. Visits later became supervised at the DCF office. The children were divided into two groups so that the visits could be more manageable. The mother's attendance was satisfactory until late 1998.
DCF referred the mother to a substance abuse program, which the mother completed in 1997. DCF asked the mother to go for a drug screen in February, 1998, and again in 1999, because of concerns arising from the father's continued drug use. Both times the mother refused to go, saying she had already gone once.
The father was admitted to the same substance abuse program as the mother in 1997 but did not complete it because of continued cocaine use. In November, 1997, the father admitted to a heroin habit. In February 1998, the father acknowledged that his heroin habit cost more than sixty dollars a day and the mother stated to DCF that she was aware of the father's ongoing drug use. The father missed a number of visits with his children because of the effects of his drug habit. The father entered four different in-patient drug programs in 1998 only to leave each one prior to completion.[3]
The mother failed to complete parenting classes in 1996, withdrew from individual counseling in 1997, and did not comply with domestic violence counseling in late 1997 and early 1998. The father did not complete domestic violence, parenting, couples, or individual counseling. Domestic incidents continued in 1997 and 1998. As a result of one incident in 1997 that involved a struggle with a knife, the mother was injured and the father went to jail for thirty days. The mother later admitted that she had drunk too much. On February 17, 1998, the mother was arrested for threatening to kill any DCF workers who attempted to remove her children. The mother was then convicted of second degree harassment and second degree failure to appear in court. CT Page 6758
The parents and four of the children attended a court-ordered psychological evaluation in December, 1997. The evaluator saw the family as dysfunctional and greatly in need of individual, couples, and family counseling.[4] He diagnosed the mother as a person with a dysthymic disorder and a dependent personality disorder who had little insight into her problems and who viewed DCF's involvement as an unwarranted intrusion into her life. The evaluator saw father's problems as substance abuse, domestic violence, and lack of employment. In the evaluator's view, the parents should not have been allowed visitation with the children unless there was a demonstration of sobriety and compliance with treatment programs. The evaluator also recommended that, because the mother (who was then pregnant with Hector) would be overwhelmed caring for six children, serious consideration be given to termination of the parental rights to Noemy, who had significant special needs, and Jennifer, because she was the least bonded to the mother.
Hector was born on January 31, 1998 and was discharged from the hospital soon thereafter. He was readmitted to the hospital on February 14, 1998, because of a high fever and suspicion of sepsis. After his discharge on February 19 with a negative work up for sepsis but with a cough, the parents were supposed to bring Hector, who was then only several weeks old, to a physician for a follow-up appointment. The parents failed to do so. A visiting nurse reported no one home at the parents' house. DCF eventually found Hector and brought him to the physician, who in turn had him taken to the emergency room because of a one pound weight loss from the time of birth. At the hospital, Hector was diagnosed with being failure to thrive.[5] The mother admitted to stretching and misusing the baby's formula because she did not have adequate resources to last between supplemental state aid payments. At the hospital, Hector ate well and gained weight. DCF obtained an order of temporary custody and Hector was discharged to foster care.
DCF filed petitions to terminate parental rights in October, 1998. The father on several occasions stated, in effect, that he did not care if his rights were terminated. When DCF asked the mother to resume counseling and service programs, the mother stated that she did not need counseling and that it did not do any good.
Beginning in late 1998 and continuing through March, 2000, the parents missed about half of the visits with the children despite DCF's provision of transportation and attempts to accommodate their schedule. At first the children were disappointed when the parents did not attend, but more recently they have been indifferent. The parents have been unable to control the children's behavior or engage their children at the visits that they did attend. The father has interacted primarily with John to the exclusion of the other children. The mother has stated to the CT Page 6759 children that she would call the police if they did not behave. The mother enrolled in parenting classes again in 1999 and again did not complete them.
The father has participated in a methadone clinic since the latter part of 1998. He tested positive for cocaine in May and June, 1999, but not in July, 1999, and apparently has been clean since then. He is living separately from the mother and there have been no domestic incidents during the last year.[6] The father is currently in poor health. He attended only one of the three days of trial.
B. The Children
The first three boys were originally placed in a foster home separate from the two girls. Jennifer moved to several different foster homes, in part to be with Noemy, who experienced difficulties, and in part because of her own temper tantrums and acting out. Beginning in 1997, John, Juliot, Jennifer, and Anthony began receiving therapy to deal with aggression, trauma, and loss and separation. Juliot, for example, told his foster mother that he was afraid to sleep because his mother used to hit him with a belt at bedtime. All four children made progress in therapy.
In August, 1999, DCF placed John, Juliot, and Jennifer with Maria A., a maternal aunt. She has provided a stable and secure home for them. The three children have become bonded to her and call her "Mommy." Maria would now like to adopt them.
Between August, 1996 and October, 1999, Noemy was moved six times and hospitalized four times due to extremely difficult behaviors. She would demonstrate an increase in aggressive and self-mutilating behaviors following visits with the parents. Visits between Noemy and the parents ended in December, 1998. In October, 1999, DCF placed Noemy in a specialized therapeutic foster clinic, where she has made progress. Because of Noemy's disclosures of abuse while in her parents' care, the clinic recommended that the parents have no further contact with her.[7]
As of February, 2000, Noemy had a diagnosis of post traumatic stress disorder, depressive disorder, and attention deficit hyperactivity disorder. Noemy is currently spending one night a week with John, Juliot, and Jennifer at the home of Maria A. DCF's plan is to place Noemy with Maria A. permanently, preferably within the next four months. Maria A. is willing to adopt Noemy.
Anthony and Hector are currently living with a maternal uncle, Jorge A., and his wife, Magdalena A. Anthony would like to live with Maria and his other siblings. If the placement of Noemy with Maria goes smoothly, DCF CT Page 6760 would then place Anthony with Maria, who would be willing to adopt him. In the meantime, Anthony visits with his other siblings regularly, as Maria A's home is within walking distance.
Hector has lived with Jorge and Magdalena A. since he was one month old. He has become bonded to them and calls them "Mommy" and "Pappi." He is developmentally on target. Jorge and Magdalena would like to adopt Hector as soon as possible. If that adoption takes place, Hector would be able to visit Anthony and his other siblings regularly at the nearby residence of Maria A.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes §17a-112(c)(1).[8] For more than three years in this case, DCF referred both parents to an array of social service programs, provided therapy and foster care for the children, and arrange for visitation of the children by the parents. Based on these facts, which are detailed above, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the parents and children.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael R.,49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919,722 A.2d 807 (1998); General Statutes § 17a-112(c)(3). In this adjudicatory phase, the court is ordinarily limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
Although there were several amendments to the petitions, the parties agree that the court should deem the adjudicatory date in this case to be October 15, 1998, the date of the filing of the original petitions. DCF has alleged the grounds of failure to rehabilitate against both parents concerning John, Noemy, Juliot, Anthony, and Jennifer, and acts of commission or omission against both parents concerning Noemy, Juliot, and Hector. The court finds that DCF has proven by clear and convincing evidence the ground of failure to rehabilitate as alleged and the ground CT Page 6761 of acts of commission or omission against the father in Noemy's case and against both parents in Hector's case.
1. Failure to Rehabilitate
The ground of failure to rehabilitate arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B). No dispute exists that the court adjudicated the five children in question neglected on November 22, 1996, thus satisfying one element of the statute.
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B). The statute requires the court to analyze the parent's rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'" In reLuis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). "In assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In reDanuael D., 51 Conn. App. 829, 840, 724 A.2d 546 (1999). The statute, however, does not require a parent to "be able to assume full responsibility for [a] child, unaided by available support systems." Inre Juvenile Appeal (84-3), 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984).
Applying these standards, the mother failed to rehabilitate during the adjudicatory period. The mother did complete a substance abuse program in 1997. But she twice refused DCF's simple and reasonable request to have an additional drug evaluation to monitor her subsequent compliance. The mother failed to complete parenting classes, individual counseling, and domestic violence sessions. Not surprisingly given this record, the mother continued to display poor parenting skills by being insensitive, thoughtless, and aggressive, and continued to engage in and suffer from domestic violence. She unrepentantly viewed DCF as the enemy when in fact DCF was only trying to help her save her family.[9] The mother also had mental health needs that she did not address. Given this record, the court finds that DCF has proven by clear and convincing evidence that the mother failed to rehabilitate during the adjudicatory period. CT Page 6762
The father's case calls for the same conclusion. His main problem was narcotics, which he did not begin to overcome during the adjudicatory period. The father also did nothing to address the issue of domestic violence and its impact on children. Related to these underlying problems was the father's continuing involvement in the criminal justice system. Despite his needs, the father did not complete even one remedial program to which he was referred by DCF. The father absented himself from the children for a period of five months and, when he returned, failed to visit them regularly. The clear and convincing evidence thus establishes that the father failed to rehabilitate during the adjudicatory period.
2. Acts of Commission or Omission
General Statutes § 17a-112 (c)(3)(C) makes it a ground for termination of parental rights when the child "has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being." This provision authorizes termination when "specific acts of parental commission or omission" have caused physical or emotional injury to the child. See In re Felicia D.,35 Conn. App. 490, 502, 646 A.2d 862, cert. denied,231 Conn. 931, 649 A.2d 253 (1994) (Internal quotation marks omitted).[10] The ground does not permit termination "based on speculation as to what acts may befall a child." In reKelly S., 29 Conn. App. 600, 614, 616 A.2d 1161
(1992).
DCF's social study recites an incident in 1992 when Juliot, then three months old, received burns from exposure to radiator coils in the parents' home. DCF did not introduce any additional evidence on this incident at trial. Because DCF did not dispel the possibility that this incident was an accident, it did not prove the ground of acts of commission or omission against Juliot by clear and convincing evidence.[11]
DCF also cites the father's hitting of Noemy in February, 1996 and the mother's presence during this incident as parental acts of commission or omission. The father's undisputed hitting of Noemy, causing bruises on her lip, black and blue marks inside her mouth, and a bloody nose, does constitute a "specific act of parental commission or omission that caused physical injury to the child. In re Felicia D., supra,35 Conn. App. 502. Although the mother was present during this incident, it is not clear that she was in a position to attempt to prevent it. Therefore, the court does not find an act of commission or omission against the mother arising from this incident. CT Page 6763
DCF next claims that the parents' act of leaving Noemy alone in the middle of the night in August, 1996 and the parents' failure to obtain immediate medical attention for Noemy's injured thumb are the basis for finding an adjudicatory ground. The parents were completely irresponsible in leaving Noemy unsupervised so that she could walk around in a drug-infested area at 4:00 a.m. They are lucky that Noemy was not hurt. As a legal matter, however, DCF did not prove that Noemy received either physical or emotional injury from this episode, or from the parents' failure to obtain immediate medical attention for Noemy's thumb, and thus DCF did not sustain its burden of proof concerning the August, 1996 incident. See In re Felicia D., supra, 35 Conn. App. 502. The court has nonetheless considered this matter in finding that the parents failed to rehabilitate.
The final allegation of acts of commission or omission concerns Hector's health shortly after his birth. Both parents are at fault for not bringing him to a doctor for a requested follow-up visit in February, 1998. His ultimate diagnosis was failure to thrive, which is a serious physical condition. The responsibility for this condition lies squarely with the parents. The mother stretched Hector's formula because, as she knew, the family's financial resources were being squandered on the father's drug habit. Neither parent sought any help for the that they put themselves in. They risked Hector's well-being to further their own selfish lifestyle choices. DCF has proven by clear and convincing evidence that both parents committed acts of commission and omission toward Hector during the adjudicatory period.
THE MOTION FOR TRANSFER OF GUARDIANSHIP
During the middle of the trial, the respondent mother filed a motion to transfer guardianship to her sister, Maria A., and her brother, Jorge A. Although the motion was not more specific, presumably the mother seeks to transfer guardianship of John, Noemy, Juliot, Anthony, and Jennifer to Maria A. and transfer guardianship of Hector to Jorge A.
Because the respondent mother filed the motion for transfer of guardianship, she bears the burden of proof. She did not meet her burden.[12] Initially, the mother's late filing of the motion suggests that she did so as a tactic to prevent termination rather than as a dispositional plan that she truly believed furthered the best interest of her children. Moreover, the mother did not prove that either prospective guardian, Maria A. or Jorge A., has any interest in a guardianship which, after all, can later be challenged in court by the natural parents. See In reJuvenile Appeal (85-BC), 195 Conn. 344, 367, 488 A.2d 790 (1985). CT Page 6764 Finally, as discussed below, the best interest of these children favors termination of parental rights, not guardianship.
DISPOSITION OF THE TERMINATION PETITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interest of all six children clearly and convincingly requires termination of the father and mother's parental rights. The father has so far freed himself of his destructive heroin and cocaine habit. But he is apparently paying the heavy price of having to use methadone and having significant health problems. He has not addressed his need for intensive counseling in the area of domestic violence or parenting skills. His recent record of visitation is poor and he interacts only with John at the visits he attends. The father has stated that he does not care if his rights are terminated.
Despite over three and one-half years of DCF involvement, the mother is completely unrehabilitated. The mother has not completed any social service programs since 1997. She retains the defiant attitude that she does not need help. Her recent record of missing visits with her children reveals her continuing indifference, and perhaps antipathy, towards resuming the burdens of parenthood. The poor quality of the visits that she has attended reveals her continuing lack of parenting skills.
The children have suffered greatly from their relationships with their parents. All five children who lived with the parents for any significant period of time have required therapy to deal with their exposure to domestic violence and physical harm. Hector, while fortunately not requiring mental health services, was hospitalized with failure to thrive due to his parents' callous disregard of their parental obligations. Despite this history, the children, except for Noemy, still wanted to see the parents at visits in 1999, only to have the parents disappoint them by failing to attend. Understandably, the children more recently have been indifferent about parental visitation.
John, Juliot, Jennifer, and Hector are in stable relative foster homes. They have bonded to their foster parents, who would like to adopt them. Terminating the parental rights of these four children would allow these adoptions to take place, thus giving these four children the safe and secure permanent home that is so important for their development. SeeLehman v. Lycoming County Children's Services, 458 U.S. 502, 513 (1982). CT Page 6765
Noemy deteriorated following visits with her parents. She has progressed since visits ended in December, 1998 and since DCF placed her in October, 1999 in the specialized foster clinic where she currently resides. But Noemy still has significant special needs. Her natural parents do not have an understanding of these special needs or an ability to manage them. The optimal plan for Noemy given all the facts and circumstances is to place her with her siblings in the foster home of Maria A., where she stands the best chance of stabilizing to the point where she can remain there permanently. Termination of parental rights would enable Noemy to put her past behind her and become an adopted child of Maria A.
Anthony does not wish to remain in his current foster home, but there is also no evidence that he wants to return to his natural parents. Anthony instead would like to live with his other siblings in the home of Maria A. Maria A. in turn would be willing to adopt Anthony. Termination of parental rights would make this result legally possible and at the same time give Anthony a stable and secure home where he wants to live. While this plan would also separate him somewhat from Hector, they will remain within walking distance.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112
(e). See In re Tabitha P., 39 Conn. App. 353, 362, 664 A.2d 1168 (1995). These factors serve only to guide this court in making the ultimate decision whether to grant the termination petition and no one finding is a prerequisite. See In re Eden F., 250 Conn. 674, 691, 741 A.2d 873
(1999). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to he parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for he children, made them available for visitation, and offered a variety of social service programs to the parents. These services were relevant to the parents' needs and were offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF made reasonable efforts to reunite the parents with their children. CT Page 6766
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On March November 22, 1996, and October 8, 1997, the court entered the following expectations for the parents to meet: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and your attorney, (3) visit the children as often as DCF permits, (4) participate in counseling: parenting, individual, family (1997 only), and drug/alcohol (1997 only), (5) sign releases, (6) no substance abuse, (7) no involvement with the criminal justice system, and (8) no domestic violence (1997 only). In the 1996 expectations, the court also ordered DCF to increase the length of the visits, if successful, to a length of two hours per visit. As detailed above, the parents did not comply with the critical expectations concerning substance abuse, domestic violence, involvement in the criminal justice system, and counseling. The father did not maintain regular contact or visitation with his children during the adjudicatory period and both parents visited irregularly after the adjudicatory period.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, John, Juliot, Jennifer, and Hector are closely bonded to their foster parents. It is not known whether Anthony and Noemy have strong emotional ties to their current care takers. The children are indifferent about their natural parents and, in some cases, have negative memories of them.
5) The age of the child.
John is ten years old. Noemy is eight, Juliot is seven, Anthony is six, Jennifer is four, and Hector is two.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child. CT Page 6767
Based on the foregoing discussion, the court finds that the parents did not adjust their circumstances in time to make it in their children's best interest to return to their home. The father's contact with his children was irregular. The mother's contact with her children was irregular from late 1998 on.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the parents' difficulties stem from their own lifestyle choices and not from unreasonable interference of other persons or economic circumstances beyond their control. The parents did engage in abusive conduct toward each other, but neither parent sought the help that DCF offered.
CONCLUSION
Based upon the foregoing findings, the court grants the petitions to terminate the parental rights of Anthony D. and Rosa A. to their six children and denies the motion to transfer guardianship. The court orders that the Commissioner of DCF is appointed statutory parent for the children for the purpose of securing adoptive families. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
 Carl J. Schuman Judge, Superior Court